```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                          :
                                                :
     HERBERT G. LINDO,                          :     Chapter 11
                                                :     Case No.: 10-13717 (SMB)
                    Debtor.                     :
-------------------------------------------------------X
HERBERT G. LINDO,                               :
                                                :
                    Plaintiff,                  :
                                                :
     – against –                                :     Adv. Proc. No. 11-2755 (SMB)
                                                :
FIGEROUX & ASSOCIATES and                       :
BRIAN FIGEROUX,                                 :
                                                :
                    Defendants.                 :
-------------------------------------------------------X
```

## MEMORANDUM DECISION VACATING DEFENDENTS' DEFAULT

**A P P E A R A N C E S:**

JASPAN SCHLESINGER LLP
Attorneys for Plaintiff
300 Garden City Plaza
Garden City, New York 11530

    Steven R. Schlesinger, Esq.
    Shannon Anne Scott, Esq.
        Of Counsel

FIGEROUX & ASSOCIATES
Attorneys for Defendants
26 Court Street, Suite 701
Brooklyn, New York 11242

    Brian Figeroux, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The plaintiff, Herbert Lindo, commenced this adversary proceeding against his former attorney primarily charging that the defendants (collectively, "Figeroux") committed professional malpractice in connection with the representation of the plaintiff in this bankruptcy case. In the main, Lindo contends that Figeroux negligently advised him to file under chapter 7 instead of chapter 11, and then failed to take steps to convert the case from chapter 7 to 11. Following Figeroux's default in this adversary proceeding, Lindo moved to enter a default judgment, and Figeroux moved to vacate his default.

Although Figeroux's neglect in this matter is shocking, the Court concludes that the dispute must be tried on the merits. Accordingly, Lindo's motion is denied and Figeroux's motion is granted.

## BACKGROUND

Lindo filed a chapter 7 petition on July 13, 2010; Figeroux signed the petition as his attorney. Lindo drives a New York City taxicab, and as of the petition date, his principal asset was his ownership of a taxi medallion affixed to his taxicab. His original Schedule B listed the taxicab at a value of $1,800, but did not mention the medallion. Elsewhere, however, his schedules referred directly or indirectly to the medallion or the debt it secured. For example, Schedule D listed a secured claim in the amount of $311,582 owed to Lomto FCU ("Lomto"), an entity that finances the purchase of medallions, although it indicated that the entire amount of the claim was unsecured. The *Chapter 7 Individual Debtor's Statement of Intention* stated that

2

Lindo intended to reaffirm his debt to Lomto. Finally, Schedule J listed a monthly payment in the sum of $2,400 in connection with the medallion.[1]

The chapter 7 trustee, Richard O'Connell (the "Trustee"), conducted a meeting of creditors pursuant to 11 U. S.C § 341 ("§341 Meeting") on August 11, 2011. It seems that until then, Figeroux believed the value of the medallion was equal to or less than the amount owed to Lomto, but learned from the Trustee at the §341 Meeting that it had substantially greater value.[2] (*See Objection to Plaintiff [sic] Motion for Default Judgment*, filed May 2, 2012, at ¶ 6 ("*Figeroux Objection*") (ECF Doc. # 11).)[3] Two weeks later, Lindo filed a cryptic motion to dismiss his case. (*See Notice of Motion*, dated Aug. 26, 2010 (ECF/Main Case Doc. # 9).) According to Lindo's accompanying affidavit, he filed under chapter 7 because someone stole his identity and ran up substantial credit card debt without his knowledge or consent. He also stated, without amplification, that he had been a taxicab driver for ten years, had no other way to earn his living, and if forced to go through with his bankruptcy petition, would lose his ability to drive his taxicab. Lindo concluded that he would seek to work out the issues resulting from the theft of his identity directly with the credit card companies, and agreed not to refile a bankruptcy case within two years. Five days later, however, Lindo withdrew his motion to dismiss, stating that unspecified critical information was "erroneously left out." (*See Motion to Withdraw*, dated Aug. 31, 2010 (ECF/Main Case Doc. # 10).)

---

[1]    Remarkably, Lindo's response to question nos. 1 and 2 in the statement of financial affairs reported that Lindo had not earned any income during 2008, 2009 and 2010. In fact, he checked the box marked "none" in response to every question.

[2]    On September 23, 2010, Lindo amended Schedules B and D to list the medallion at a value of $600,000.

[3]    "ECF" refers to the docket in this adversary proceeding while "ECF/Main Case" refers to the docket in Case No. 10-13717.

The discovery of the medallion and its value spurred the Trustee to act. On September 2, 2010, he filed a motion to retain Samuel E. Kramer, Esq. as his attorney, (*see Application to Retain Samuel E. Kramer as Proposed Attorney for Trustee*, dated Aug. 30, 2010 (ECF/Main Case Doc. # 11)), and on September 8, 2010 and September 17, 2010, Kramer e-mailed or wrote to Figeroux instructing him to turn over the taxicab and medallion to the Trustee's auctioneer, MYC Associates, Inc. ("MYC"). (*See Declaration in Support of Trustee's Motion to Compel Turnover of Property*, dated Sept. 24, 2010, at ¶¶ 9, 11 (ECF/Main Case Doc. # 16).) According to Kramer, Figeroux did not respond.

On September 24, 2010, Kramer filed an application to compel Lindo to turn over the taxicab and medallion to the Trustee. (*See Notice of Motion*, dated Sept. 24, 2010 (ECF/Main Case Doc. # 16).)[4] Lindo did not file a response to the turnover application or oppose the motion, although his counsel appeared at the hearing. (*See Motion for an Order Finding Herbert G. Lindo in Contempt of Court for Violating the October 20, 2010 Order Directing Turnover of a Taxicab and Medallion*, dated Dec. 1, 2010, at ¶ 3) ("*Contempt Motion*") (ECF/Main Case Doc. # 28).) The Court granted the motion, and by order dated October 20, 2010, directed Lindo to deliver his taxicab and medallion to MYC. (*See Order Directing Turnover of Property*, dated Oct. 20, 2010) (ECF/Main Case Doc. # 22).)

Lindo failed to comply with the turnover order. As a result, by order dated November 16, 2010, the Court directed Lindo to show cause why the United States Marshal should not be authorized to seize his taxicab and medallion and deliver them to MYC. (*See Order to Show*

---

[4]    On October 9, 2010, the Trustee also commenced an adversary proceeding against Lindo objecting to his discharge based upon his failure to disclose his ownership of the taxi medallion worth in excess of $600,000 or the income derived from it. (*See Complaint in an Adversary Proceeding*, dated Oct. 9, 2010, at ¶1 (ECF/Main Case Doc. # 20).) That proceeding was eventually dismissed.

4

*Cause*, dated Nov. 15, 2010 (ECF/Main Case Doc. # 25).)[5] Lindo failed to oppose the order to show cause, and by order dated December 13, 2010, the Court granted the motion. (*See Order*, dated Dec. 13, 2010 (ECF/Main Case Doc. # 33).) On December 1, 2010, the Trustee also filed the *Contempt Motion*, but withdrew it on January 16, 2011, because the taxicab and medallion had been seized by the United States Marshal in the interim and were in MYC's possession. (*See Letter from Samuel E. Kramer to the Court*, dated Jan. 16, 2011) (ECF/Main Case Doc. # 40).)

On January 31, 2011, the Court approved a stipulation pursuant to which Lindo's present counsel (Jaspan Schlesinger LLP) replaced Figeroux. (*See So Ordered Consent Agreement to Substitute Attorneys for Herbert G. Lindo*, dated Jan. 31, 2011 (ECF/Main Case Doc. # 43).) Twelve days later, Lindo filed a motion to convert his case from chapter 7 to 11, and allow him to regain possession of the taxicab and medallion pending confirmation of his chapter 11 plan. (*See The Debtor's Motion for the Entry of an Order to Schedule a Hearing on Shortened Notice to Allow the Debtor Herbert G. Lindo to Convert his Bankruptcy Case from a Chapter 7 to a Case under Chapter 11 and to Regain Possession of a Taxicab and Medallion from the Chapter 7 Trustee as a Debtor in Possession Pending Confirmation of a Chapter 11 Plan* dated Feb. 14, 2011 (ECF/Main Case Doc. # 45).) The Trustee initially opposed the conversion motion, (*see Chapter 7 Trustee's Memorandum of Law in Opposition to Motion by Debtor, Herbert G. Lindo, to: (I) Convert his Bankruptcy Case to One Under Chapter 11; and (II) Regain Possession of a Taxicab and Medallion from the Chapter 7 Trustee as a Debtor in Possession Pending Confirmation of a Chapter 11 Plan*, dated Feb. 23, 2011 (ECF/Main Case Doc. # 48)), but it was eventually granted pursuant to a consent order signed on May 5, 2011. (*See Order to Convert*

---

[5] The docket reflects that a similar order to show cause had been signed on November 1, 2010. (*See Order to Show Cause*, dated Nov. 1, 2010 (ECF/Main Case Doc. # 23).) The record does not reflect the reason for the second order to show cause, and none of the supporting papers were ever filed.

5

*Case Under Chapter 7 to Chapter 11 and to Allow the Debtor Herbert G. Lindo to Regain Possession of a TaxiCab and Medallion From the Chapter 7 Trustee as a Debtor in Possession*, dated May 5, 2011 (ECF/Main Case Doc. # 53); *Amended Order to Convert Case Under Chapter 7 to Chapter 11*, dated June 1, 2011 (ECF/Main Case Doc. # 58).)

Lindo's trip through chapter 7 was an expensive one. The Trustee incurred substantial legal and other expenses attempting to gain possession of the taxicab and medallion. Those expenses were fixed when the Court awarded the aggregate sum of $78,905.06 in fees and expenses to the Trustee and his professionals. (*See Order Granting Applications for Allowance of First and Final Compensation and Reimbursement of Expenses*, dated Mar. 12, 2012 (ECF/Main Case Doc. # 99).) The bulk of this award, $55,520, went to Kramer, who expended a significant amount of time and effort obtaining possession of the taxicab and medallion. Lindo's estate was responsible for these sums, and paid them.

Lindo commenced this adversary proceeding on September 28, 2011. The thrust of his complaint is that Figeroux negligently advised him to file under chapter 7 instead of under chapter 11 or suggest that he pursue an out of court workout by refinancing the Lomto debt and using the proceeds to satisfy his creditors. Once chapter 7 ensued, the Trustee seized the taxicab and medallion, and Lindo was unable to earn a living for four months. After Figeroux realized the mistake, he failed to take corrective measures, such as dismissing the case or converting it to chapter 11. Figeroux also failed to prepare adequate schedules and a statement of financial affairs, which resulted in the commencement of an adversary proceeding objecting to Lindo's discharge.

6

Lindo suffered substantial monetary damages as a result of these mistakes. As noted, he had to pay the Trustee and his professionals in excess of $78,000. Lindo estimates that he lost roughly $36,000 in earnings during the period the Trustee had possession of the taxicab and medallion. He also maintains that Lomto's claim increased by $76,000 after the petition date. Finally, Lindo incurred substantial fees to Jaspan Schlesinger just to unwind the mess.

The complaint asserts four claims for relief: malpractice, breach of fiduciary duty, breach of the covenant of good faith and fair dealing and unjust enrichment. The first three claims are duplicative, and the unjust enrichment claim seeks to recover the $3,500 that Lindo paid Figeroux as a legal fee prior to filing the chapter 7 case.

Though duly served, Figeroux failed to answer the complaint by the October 31, 2011 deadline, and also failed to appear at a pretrial conference held on November 17, 2011. After the Clerk of the Court certified the default, Lindo moved for entry of a default judgment on April 13, 2012. (*See Notice of Motion in Support of an Entry of an Order of Default Judgment Against Figeroux & Associates and Brian Figeroux, Individually, as Jointly and Severally Liable to the Debtor and Debtor in Possession Herbert G. Lindo*, dated Apr. 13, 2012) (ECF Doc. # 7).) Figeroux objected to Lindo's motion, and filed his own motion to vacate the default. (*See Figeroux Objection*; *Affirmation in Opposition to Default Judgment* dated May 17, 2012 (ECF Doc. # 12).)

**DISCUSSION**

Rule 55(c) of the Federal Rules of Civil Procedure allows a court to set aside the entry of default for "good cause."[6] "Under Rule 55(c), the factors governing whether a party should be relieved from default are whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented." *Men's Sportswear, Inc. v. Sasson Jeans, Inc.* (*In re Men's Sportswear, Inc.*), 834 F.2d 1134, 1138 (2d Cir. 1987); *accord State Bank of India v. Chalasani* (*In re Chalasani*), 92 F.3d 1300, 1307 (2d Cir. 1996); *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993).[7] The standards for setting aside a default or a default judgment are the same, but courts apply them more rigorously in the case of a default judgment because the latter more deeply implicates the concepts of finality and litigation repose. *See Am. Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 59 (2d Cir. 1996); *Enron Oil Corp.*, 10 F.3d at 96; *cf. Meehan v. Snow,* 652 F.2d 274, 277 (2d Cir. 1981) (describing the standard under Rule 55(c) as "lenient"). Although a defendant is not free to flout the rules of procedure without consequence, defaults are generally disfavored, and there is a "strong preference for resolving disputes on their merits." *See Sony Corp. v. Elm State Elecs., Inc.*, 800 F.2d 317, 320 (2d Cir. 1986) (citation omitted); *accord Enron Oil Corp.*, 10 F.3d at 96 ("[W]hen doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party."); *Meehan*, 652 F.2d at 277 ("While courts are entitled to enforce compliance with the time limits of the Rules by various means, the extreme sanction of a default judgment must remain a weapon of last, rather than first, resort.").

---

[6] Rule 55(c) states: "The court may set aside an entry of default for good cause, and it may set aside a default judgment under Rule 60(b)." Rule 55(c) is made applicable to this adversary proceeding by FED. R. BANKR. P. 7055.

[7] A court may also consider other relevant equitable factors, such as whether the failure to follow a rule of procedure was a mistake made in good faith, and whether the entry of default would lead to a harsh result. *See Enron Oil Corp.*, 10 F.3d at 96.

8

**1.    Willfulness**

"Willfulness" refers to conduct that is deliberate, *see Gucci Am., Inc. v. Gold Ctr. Jewelry*, 158 F.3d 631, 635 (2d Cir. 1998), *cert. denied*, 525 U.S. 1106 (1999), as opposed to negligent or careless. *See SEC v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998), *cert. denied*, 525 U.S. 931 (1998); *Am. Alliance Ins. Co.*, 92 F.3d at 61.  In this case, Figeroux promptly turned the pleadings over to a *per diem* attorney at the firm to draft an answer, (*see Affirmation [of Brian Figeroux] in Opposition to Default Judgment*, dated May 17, 2012, at ¶ 3) (ECF Doc. # 12)), and spoke to the attorney on a weekly basis.  He was informed that "detailed legal research" was being done in order to prepare the answer, (*see id.* at ¶ 4), and continued to receive similar assurances until late November.  (*See id.* at ¶ 5.)  At that point, Figeroux asked the attorney to return the file and submit whatever work he had done.  (*See id.*)  The attorney did not return the file until January 2012, at which time he also indicated that he could no longer work on the matter and had not prepared an answer.  *(See id.* at ¶ 6.)

By then, Figeroux realized that the time to file an answer had passed.  He intended to seek an extension, but discovered that the Clerk had entered the default on November 28, 2011.  (*See id.* at ¶ 7.)  Figeroux asked his staff to telephone Lindo's counsel to request a stipulation vacating the default.  His staff made contact in March, at which time Lindo's counsel indicated "that she would not object to the firm filing a motion seeking to vacate the default judgment and who added that further discussions would be needed between us."  (*Id.* at ¶ 8.)  Unable to secure the stipulation, Figeroux filed the motion to vacate the default on May 2, 2012.

Figeroux's excuse amounts to a litany of neglect.  He failed to supervise the *per diem* attorney, and continued to accept the latter's assurances that an answer was being prepared well after the date it was due.  Figeroux does not say that he directed the attorney to seek an extension

9

of time. Although he asked for the file and work product in late November, there is no evidence that he followed up on this request, and in fact, received just part of the file in January. By then, Figeroux knew the Clerk had entered a default, but instead of contacting Lindo's counsel directly, he assigned the task to a member of his staff who did not speak to Lindo's counsel until March.

Although this level of neglect is perplexing, the Second Circuit has cautioned that "[w]e see no reason to expand this Court's willfulness standard to include careless or negligent errors in the default judgment context." *Am. Alliance Ins. Co.*, 92 F.3d at 61. While the degree of negligence is relevant and gross negligence can weigh against the party seeking relief from a default judgment, (*see id.*), the Court will give Figeroux the benefit of the doubt and conclude that his default was not willful. It was certainly not due to any calculated choice, but instead, to negligent lawyering.

### 2. Prejudice

Legal prejudice occurs when the non-defaulting party's ability to proceed with its case has been impaired. *See MacEwen Petroleum, Inc. v. Tarbell*, 173 F.R.D. 36, 40 (N.D.N.Y. 1997), *appeal dismissed*, 136 F.3d 263 (2d Cir. 1998). Delay alone does not constitute prejudice. *See Enron Oil Corp.*, 10 F.3d at 98. Rather, the delay must "result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion." *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983) (internal quotation marks and citation omitted).

The only prejudice identified by Lindo relates to additional legal fees he incurred in seeking to enter the default judgment, and requests that in the event the Court vacates the default,

it should require Figeroux to pay these costs. (*See Reply to Defendants' Objection to Plaintiff's Motion for Default Judgment*, dated June 19, 2012, at 11 (ECF Doc. # 13).) The increased costs of pursuing a default judgment or opposing a motion to vacate a default do not constitute the type of prejudice that must be considered; if it was, it would exist in every case. Moreover, Lindo failed to identify any authority to condition the vacatur of Figeroux's default on the payment of attorneys' fees.[8] In conclusion, Lindo has failed to show legal prejudice.

### 3. Meritorious Defense

Although the movant need not establish a meritorious defense conclusively, it "must present evidence of facts that, if proven at trial, would constitute a complete defense." *McNulty*, 137 F.3d at 740 (internal quotation marks and citation omitted); *accord Sony Corp.*, 800 F.2d at 320-21. Conclusory denials or statements lacking factual support are insufficient. *See Pecarsky v. Galaxiworld.com, Ltd.*, 249 F.3d 167, 173 (2d Cir. 2001); *Enron Oil Corp.*, 10 F.3d at 98; *Sony Corp.*, 800 F.2d at 320.

Here, the complaint identified four general areas of alleged malpractice: (1) the pre-petition decision to file a chapter 7 case; (2) the post-petition failure to dismiss the chapter 7 case or convert it to chapter 11 once Figeroux learned of the true value of the medallion; (3) the post-petition failure to advise Lindo to turn over the taxicab and medallion; and (4) the preparation of schedules and statement of financial affairs containing numerous errors and omissions. The first

---

[8]  Lindo submitted a "supplemental reply" in which he suggested, *inter alia*, that Figeroux should be liable for the payment of the attorneys' fees incurred in connection with the default judgment motion pursuant to Rule 9011 of the Federal Rules of Bankruptcy Procedure, 28 U.S.C. §1927, the Court's inherent power, and the contempt power. (*See Supplemental Reply Memorandum of Law in Further Support of the Entry of an Order of Default and Default Judgment Against Defendants*, dated July 10, 2012 (ECF Doc. # 14).) These provisions authorize sanctions in certain circumstances, and Lindo is free to make a motion for sanctions or contempt to the extent permitted by applicable law. However, I decline to award sanctions or an order of contempt first requested in a supplemental reply.

three categories concern acts or inaction that contributed to virtually all of the damages alleged by Lindo, and I turn to the evidence proffered by Figeroux regarding these charges.

### a. The Decision to File a Chapter 7 case.

All parties agree that Lindo's reason for filing was the substantial credit card debt incurred by the thief who stole his identity. According to Figeroux, he and Lindo consulted, and "based on the information provided by the client at that time, the course of action chosen was to file a Chapter 7 bankruptcy petition in order to have the Debtors [*sic*] debts of over $137,000 dollars [*sic*] to be [*sic*] discharged." (*Figeroux Objection* at ¶ 26.) In the course of those consultations, Lindo also disclosed that he owned a medallion that secured a debt in the amount of $307,000 which Lindo intended to reaffirm. (*See id.* at ¶ 4.)

Assuming that the value of the medallion was equal to or less than the debt it secured, the decision to file under chapter 7 was unobjectionable. The chapter 7 discharge would eliminate the unauthorized debt. The Trustee would abandon the medallion because there was no equity. *See* 11 U.S.C. § 554(a) (authorizing a trustee to abandon property that is of inconsequential value and benefit to the estate). Through a reaffirmation agreement, Lindo would deal directly with his secured creditor outside of the bankruptcy. *See* 11 U.S.C. § 524(c).

On the other hand, Lindo contends that filing under chapter 7 was poor advice because he had substantial equity in the medallion.[9] As occurred, the Trustee would then demand turnover and if necessary seize the medallion (and the taxicab to which it was attached) with the idea of

---

[9] Lindo also argues that he could have bypassed bankruptcy, refinanced the secured debt and paid off the creditors with the excess proceeds. Under those circumstances, however, he could not have discharged the unauthorized credit debt, and ultimately, would have had to pay it unless he could successfully defend efforts to collect the debt or convince his creditors to accept less. Under his plan, he made a 10% distribution on this debt, probably because it was cheaper than litigating objections to the claims.

12

selling it. Indeed, Figeroux has never contended that a chapter 7 case would be appropriate in that circumstance.

Thus, the propriety of recommending that Lindo file a chapter 7 case turns on what Figeroux knew or should have known about the value of the medallion. Figeroux appears to concede that he did not learn of the true value of the medallion until the §341 Meeting. (*See id.* at ¶ 6.) The propriety of the initial decision to file a chapter 7 case hinges, therefore, on what Figeroux and Lindo discussed regarding the medallion prior to the petition date, and what Figeroux did or should have done to determine the value of the medallion before advising Lindo to file a chapter 7 case. I cannot, in this regard, conclude as a matter of law that the failure to make an independent inquiry into value, as Figeroux apparently failed to do, constitutes malpractice. Accordingly, Figeroux has presented sufficient evidence of a meritorious defense on this point.

    b.  **Post-Petition Action and Inaction**

Once Figeroux learned of the true value of the medallion, Lindo could not remain in chapter 7 for the reasons stated, and Figeroux had to do something on his behalf. Ostensibly, Figeroux failed to take the steps necessary to protect Lindo's right to possess and use the medallion, including his right to continue to earn a living, and appeared to ignore the Trustee's aggressive efforts to obtain possession of the property. Figeroux filed a motion to dismiss the case, but withdrew it after the Trustee indicated he would object, apparently because the motion did not provide for payment of the Trustee's fees and expenses. (*See id.* at ¶ 27.) When the Trustee demanded turnover of the taxicab and medallion, property Lindo had to turn over under 11 U.S.C. § 542(a), Figeroux allegedly ignored the Trustee's demands. When the Trustee thereafter commenced litigation to compel the turnover, Lindo failed to oppose it and ignored the

13

ensuing turnover order. When the Trustee then made a motion to authorize the United States Marshal to seize the taxicab and medallion, Figeroux again defaulted.

Figeroux tells a different story. After the Trustee filed a motion to seize the medallion and taxicab, Figeroux engaged in settlement talks with the Trustee, and according to Figeroux, they agreed that Lindo would refinance the medallion, pay creditors and dismiss the petition. (*See id.*) Figeroux contends that Lindo eventually refinanced the secured debt on his watch, and Lomto issued a check in the amount of $137,000, the sum the Trustee agreed was necessary to satisfy all creditors. (*See id.*) The Trustee informed Figeroux that the tender was insufficient because it did not cover the Trustee's fees, and Lindo refused to pay more. (*See id.*) Figeroux continued to attempt to settle the matter with the Trustee but talks broke down, and no agreement was reached. (*See id.*)

Figeroux's story is not entirely credible. The record shows that Lindo did not refinance the debt secured by the medallion until after successor counsel replaced Figeroux and the case was converted to chapter 11. (*See Order (I) Authorizing the Debtor to Refinance Certain Assets and Obtain Post-Petition Financing Pursuant to Sections [sic] 364 of the Bankruptcy Code; (II) Granting First Priority Security Interests in and Liens Against Certain Assets to Lomto FCU; (III) Granting Lomto FCU a Superpriority Administrative Expense Claim; and (IV) Granting Related Relief,* dated Aug. 17, 2011 (ECF/Main Case Doc. # 73).) Until then, it seems unlikely that Lomto would have handed over a $137,000 check. It also seems far-fetched that Lindo would willingly agree to pay the very credit card debt he filed chapter 7 to discharge. Furthermore, Figeroux did not extract a stipulation staying the proceedings while he negotiated with the Trustee, and the costs incurred by the Trustee in pursuing the turnover of the medallion continued to run up.

14

Nevertheless, the thrust of Figeroux's opposition to the default judgment and his motion to vacate its default is that he and the Trustee reached an agreement on the disposition of the case, but their settlement broke down at the last minute after the Trustee insisted on additional contribution to cover his fees and expenses before the case could be dismissed. If true, it might have been reasonable for Figeroux to avoid running up legal expenses making or defending motions that a settlement would moot. Once again, I cannot conclude as a matter of law that Figeroux's defense lacks merit, and given the preference for deciding disputes on their merits, the Court will deny Lindo's motion to enter a default judgment, and grant Figeroux's motion to vacate his default.

The attorney for Lindo is directed to submit a proposed order consistent with this decision. That order should include a decretal paragraph that directs Figeroux to file an answer or make a motion within fourteen days of the order. Finally, Lindo's counsel should contact chambers to schedule a pre-trial conference for a time after the answer or motion is due.

Dated: New York, New York
       September 5, 2012

                                            /s/ *Stuart M. Bernstein*
                                            STUART M. BERNSTEIN
                                            United States Bankruptcy Court