UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
In re:                                       :
                                             :
        HERBERT G. LINDO,                     :          Chapter 11
                                             :          Case No.:  10-13717 (SMB)
                Debtor.                       :
------------------------------------------------------X
HERBERT G. LINDO,                            :
                                             :
                Plaintiff,                    :
                                             :
        – against –                          :          Adv. Proc. No. 11-02755 (SMB)
                                             :
FIGEROUX & ASSOCIATES and                    :
BRIAN FIGEROUX,                              :
                                             :
                Defendants.                   :
------------------------------------------------------X

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A P P E A R A N C E S:**

JASPAN SCHLESINGER LLP
*Attorneys for Plaintiff*
300 Garden City Plaza
Garden City, New York 11530

        Shannon Anne Scott, Esq.
            Of Counsel

FIGEROUX & ASSOCIATES
*Attorneys for Defendants*
26 Court Street, Suite 701
Brooklyn, New York 11242

        Julius Simpson, Esq.
            Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

i

The Debtor, Herbert G. Lindo, brought this action against his former attorney alleging professional malpractice, breach of fiduciary duty, breach of the covenant of good faith and fair dealing and unjust enrichment.  Lindo contends that the defendant should have advised him to file a chapter 11 case or work out his financial problems outside of bankruptcy rather than file a chapter 7 case which he did.  The Court conducted a two-day bench trial during which it heard the testimony of several witnesses and received numerous documents into evidence.  Based upon the proposed findings of fact and conclusions of law that follow, the Court recommends that a final judgment be entered against the defendants in the amount of $134,224.37.

## PROPOSED FINDINGS OF FACT[1]

### The Parties

Brian Figeroux is an attorney duly licensed to practice law before the courts of the State of New York and the Southern District of New York.  (Stipulated Facts A.)  He is a solo practitioner, and spends approximately ten per cent of his time on bankruptcy matters.  (Tr. (5/20) at 16:5-17.)  He has never filed a chapter 11 case on behalf of a client.  (Tr. (5/20) at 100:13-14.)  Figeroux and his firm, Figeroux & Associates, will be referred to collectively as "Figeroux."

---

[1]    The following conventions are used in this report:

"ECF Doc #" refers to the electronic docket in this adversary proceeding; "Main Case ECF Doc. #" refers to the electronic docket in bankruptcy case no. 10-13717.

"Tr. (5/20)" refers to the transcript of the trial held on May 20, 2013 (ECF Doc. # 31), and "Tr. (6/5)" refers to the transcript of the trial held on Jun 5, 2013 (ECF Doc. # 33).  The page and line references in the transcripts are separated by a colon.  For example, "Tr. (5/20) at 100:1-5" refers to page 100, lines 1 through 5 in the May 20, 2013 transcript.

Finally, "Stipulated Facts" refers to the Section IX in the *Joint Final Pre-Trial Order*, dated Apr. 25, 2013 (ECF Doc. # 24), and "Ex." refers to the forty-four exhibits identified in Section VI of the *Joint Final Pre-Trial Order* that the parties agreed were admissible.

Lindo has been a cab driver for over ten years. (Tr. (5/20) at 118:13-16.) At all relevant times, his principal asset was a yellow taxi cab and taxi medallion that he purchased around 1999. (Tr. (5/20) at 118:17-20.)

**Pre-Bankruptcy Events**

Lindo first came to Figeroux seeking advice regarding a bankruptcy on or about October 6, 2009. (Tr. (5/20) at 20:1-4.) The parties dispute the reasons that prompted the visit. According to Lindo, he sought advice because he owned a house that was in foreclosure, and he wanted to stop the foreclosure. (Tr. (5/20) at 119:10-19; 159:19-21.) He testified that his uncle, David Cole, used Lindo's social security number to purchase the house in Lindo's name. (Tr. (5/20) at 156:12-22.) Cole also apparently incurred unauthorized debt in Lindo's name. (Tr. (5/20) at 159:14-17; 162:3-19.) Lindo did not reside in the house, (Tr. (5/20) at 170:21-23), and never made any monthly mortgage payments. (Tr. (5/20) at 172:15-16.) Lindo testified that he could not recall whether he advised Figeroux that a family member had obtained the house fraudulently in Lindo's name. (Tr. (5/20) at 157:9-12.) The foreclosure sale and delivery of the Referee's Deed of Foreclosure occurred on October 8, 2009, two days after Lindo first came to see Figeroux. (*See* Ex. 5.)

According to Figeroux, Lindo's principal complaint was that a family member had used his credit. Almost all of his unsecured debt was incurred through the relative's fraud, (Tr. (5/20) at 76:20-77:10), which he wanted to discharge it. (*See* Ex. 44 at ¶ 3 (p. 3 of 26).) Lindo did not disclose the foreclosure, (Tr. (5/20) at 41:3-9), and Figeroux was not aware of the foreclosure. (Tr. (5/20) at 27:16-18; 38:8-10.)

3

When Lindo first visited Figeroux, the latter followed his standard procedure of asking the client to fill out a one page intake form. (*See* Ex. 4.) The form consisted of five parts: (1) the client's personal information, including his name, address, phone number, *etc.* (2) a list of documents that the client might have to provide, (3) a separate section to supply information regarding real estate owned by the client, (4) a section entitled attorney notes, and (5) a section entitled attorney fees. (Ex. 4.) Figeroux did not ask his clients to fill out a questionnaire disclosing the relevant information needed to decide whether to file bankruptcy, and if so, under which chapter. Instead, the client sat with a bankruptcy paralegal who recorded the information provided by the client directly into the computer bankruptcy software. (Tr. (5/20) at 24:24-25:4.)

In Lindo's case, his intake form contained a check mark next to various documents including tax returns and home and auto insurance declarations, indicating that Lindo was asked to provide them. (Tr. (5/20) at 20:13-20; *see* Ex. 4.) Neither Figeroux nor any of his employees took notes when Lindo first sought advice, (Tr. (5/20) at 20:24-21:2), and Figeroux's memory of their meetings was poor. He could not recall asking Lindo if he had any insurance policies, (Tr. (5/20) at 23:6-8), if he was a party to any lawsuits, (Tr. (5/20) at 27:12-14), or if any of his property had been garnished, attached or seized. (Tr. (5/20) at 27:19-21.) He also could not remember whether Lindo had produced a car insurance certificate, (Tr. (5/20) at 41:20-22; 42:2-4), or whether he had prepared his 2008 or 2009 tax returns, (Tr. (5/20) at 99:14-17.).[2] When asked whether Lindo had signed a retainer letter, Figeroux testified that he had a standard

---

[2]      Lindo's 2009 tax returns would not have been due until April 15, 2010.

4

retainer agreement but had not found one signed by Lindo, and believed it had been misplaced. (Tr. (5/20) at 99:20-24.)

On the critical issue in this case, Figeroux testified that that although Lindo came to his office five to eight times before filing bankruptcy, he did not know that Lindo owned a taxi medallion prior to the bankruptcy filing.  (Tr. (5/20) at 27:25-28:15; 45:8-11.)  As discussed below, the evidence showed otherwise.

**The Bankruptcy Filing**

Lindo filed this chapter 7 case on July 13, 2010 (the "Petition Date"), roughly nine months after his initial interview with Figeroux.  (*See* Stipulated Facts H.)  Figeroux signed the petition as Lindo's attorney.  (Ex. 6 at P0002.)  Figeroux did not consider recommending that Lindo file under chapter 11, (Tr. (5/20) at 86:12-17), or chapter 13, (Tr. (5/20) at 28:16-19), which would have allowed Lindo to retain possession and control of his assets and pay his creditors pursuant to a court-approved plan over time.

Figeroux also prepared Lindo's Schedules and Statement of Financial Affairs ("SOFA") which were filed with the petition.  (*See* Stipulated Facts J.)  The Schedules and SOFA were rife with obvious errors, inconsistencies and red flags:

1.    Schedule A listed Lindo's ownership of a single family dwelling located at 104 North Terrace, Mount Vernon, NY 10550 valued at $321,244.00 with no secured debt.  (Ex. 6 at P0006.)  Lindo did not exempt the house, (*see* Ex. 6 at P0010), which meant he had $321,244.00 in equity that a chapter 7 trustee could seize and sell.[3]

---

[3]    This was the property that had been transferred to a third party pursuant to the Referee's Deed of Foreclosure nine months earlier.   Figeroux claimed Lindo did not tell him about the foreclosure or the sale. Whether he did or not, Lindo did not care about the house and it does not form any part of his damage claim.

2.      Schedule D, however, listed two secured creditors, Litton Loan Servicing ("Litton") with a claim in the amount of $312,000.00 and Lomto FCU ("Lomto") with a claim in the amount of $311,582.00.  (Ex. 6 at P0011.)  Figeroux thought that that both claims were secured by Lindo's house, (Tr. (5/20) at 31:11-19), the same house that Schedule A listed as unencumbered.  Figeroux conceded that if Lomto's lien was secured by Lindo's house it was a mistake not to list it on Schedule A.  (Tr. (5/20) at 32:6-9.)

3.      More perplexing, the Chapter 7 Individual Debtor's Statement of Intention stated that Lindo intended to surrender (*i.e.*, turn over to the lien holder) the property securing the Litton debt but reaffirm (*i.e.*, retain) the property securing Lomto's debt.  (Ex. 7 at P0027.)  If, as Figeroux thought, the same real property secured both debts, the Statement of Intention meant that Lindo intended to surrender and also retain the same piece of collateral.

4.      Schedule B did not list the medallion as an asset, but did state that Lindo owned a twenty-three year old "1987 Yellow Cab Taxi – Ford Crown Victoria."  (Ex. 6 at P0009.)  When shown a draft of the schedules, Joseph Maniscalco, Esq., Lindo's expert, said he would have questioned why such an old car was listed on Schedule B.  (Tr. (6/5) at 31:12-15.)  Had Figeroux reviewed Lindo's New York State Department of Motor Vehicle Insurance Certificate, (Ex. 11), which Lindo was asked to provide through the intake form, Figeroux would have discovered that Lindo owned a 2008 Ford.  Furthermore, although the schedules referred to a "medallion," Figeroux did not connect it to the taxicab.

5.      According to Figeroux, Lindo wanted to file chapter 7 to discharge debts incurred in his name but without his consent by a relative—his uncle, David Cole.  Schedule F listed five credit card debts and two educational debts.  (Ex. 6 at P0013-14.)  Yet Figeroux failed to check the appropriate boxes on Schedule F indicating that any of the debts were "disputed."[4]  (*Id.*)

6.      Schedule I listed $6,083.33 as Lindo's average monthly gross income as a taxi cab driver, (Ex. 6 at P0017), and Schedule J listed his average monthly business expenses in the amount of $3,300.00 and his total monthly expenditures as $7,359.95.  (Ex. 6 at P0018.)  The latter sum included monthly installment payments of $2,400.00 toward a "Medallion."  (Ex. 6 at P0018, line 13(b).)  However, the $3,300.00 business expense number already included the $2,400.00 monthly "medallion" payments.  (Tr. (5/20) at 36:4-7.)  As a result, the monthly expenses were overstated by $2,400.00, (Tr. (5/20) at 36:18-20), and instead of negative cash flow, Lindo actually had positive cash flow of $1,123.38 per month.

7.      Although Figeroux knew that Lindo drove a cab, and earned gross monthly income of roughly $6,000.00, the response to SOFA Question No. 1 stated that Lindo had not earned any gross income from the operation of a business during 2008, 2009 or the first six

---

[4]      Lindo testified at trial that the three debts to Chase aggregating $67,742.00 were fraudulently incurred by his uncle.  (Tr. (5/20), at 161:23-162:19.)

months of 2010.  (Ex. 8 at P0020.)  Figeroux admitted at trial that the response was wrong.  (Tr. (5/20) at 38:23-39:2.)

8.       Lindo had paid Figeroux a $3,500.00 retainer, (Ex. 12 at P0029), but the response to SOFA Question No. 9 stated that Lindo had not made any payments relating to debt counseling or bankruptcy.  (Ex. 8 at P0022.)

**The Section 341(a) Meeting**

The U.S. Trustee appointed Richard E. O'Connell (the "Trustee") to serve as the chapter 7 trustee of the estate and he duly qualified as the permanent trustee in Lindo's chapter 7 case. (Stipulated Facts I.)  The Trustee conducted the section 341(a) meeting of Lindo's creditors on August 11, 2010, and Lindo attended accompanied by Frank Castel, Esq., an associate of Figeroux.

The recording of the section 341(a) meeting was received in evidence as Ex. 15, and a transcription prepared by one of the parties was received, with the other party's consent, as Ex. 15-A.  When the Trustee asked Lindo if he had listed all his assets, Castel volunteered that the taxi medallion had not been listed.  (Ex. 15-A at 1.)  Lindo also testified that he drove a 2008 car, not a 1987 model.  (Ex. 15-A at 2.)  Castel asked the Trustee whether Lindo should move to dismiss his case.  (Ex. 15-A at 3.)  The Trustee responded that he could make the motion if that was what he desired.  However, the Trustee would only consent to the motion if Lindo agreed not to refile for two years, because if the case remained in bankruptcy, the Trustee could sell the medallion and pay off all of the creditors.  (Ex. 15-A, at 3-4.)  Castel reiterated that he would make the motion, and the Trustee pointed out that it should be made under Bankruptcy Code § 305 and not Bankruptcy Code § 707.  (Ex. 15-A, at 4.)

7

Figeroux did file a motion to dismiss the case on August 26, 2010. (Ex. 16.) However, he withdrew the motion without prejudice five days later to address unidentified concerns raised by the Trustee,[5] (Ex. 17), and never renewed it.

**The Amended Schedules**

On or about September 23, 2010, Figeroux prepared and Lindo filed an amended schedule "B," "D" and SOFA. (Ex. 18, 19 and 20.) The amended schedules listed the medallion and Lomto's secured claim, (Ex. 18 at P0044; Ex. 19 P0045), but continued to state that Lindo owned a 1987 motor vehicle, (Ex. 18 at P0044), even though Lindo had testified at the section 341 meeting that he owned a 2008 car. (Ex. 15-A at 2.) In addition, the amended SOFA still listed no gross income for 2008, 2009 or 2010, (Ex. 20 at P0046), and no payments on account of debt counseling or bankruptcy. (Ex. 20 at P0048.)

**The Trustee's Efforts to Recover the Taxicab and Medallion**

Once Figeroux withdrew the motion to dismiss, the Trustee took steps to recover the taxicab and medallion. After retaining Samuel E. Kramer as his attorney, (Ex. 22), and MYC & Associates, Inc. as his auctioneer, (Ex. 23), he filed a motion on or about September 24, 2010 to compel Lindo to turn over the taxicab and medallion (the "Assets") for the benefit of Lindo's estate. (Stipulated Facts P; *see* Ex. 21.) Lindo did not oppose the motion, and the Court granted

---

[5]     The motion to dismiss was patently deficient. The ground for dismissal was Lindo's intention to refinance his medallion loan and pay his creditors outside of bankruptcy. The motion to dismiss did not mention Lindo's intention to refinance the medallion or pay his creditors.

it pursuant to an order dated October 20, 2010 (the "Turnover Order").  (Stipulated Facts Q; Ex. 27.)

Lindo failed to comply with the Turnover Order.  As a consequence, on November 15, 2010, the Court signed an Order to Show Cause submitted by the Trustee that sought, *inter alia*, an order directing the U.S. Marshal to seize and take possession of the Assets and deliver them to the Trustee's auctioneer.  (Ex. 29.)  Lindo again failed to oppose the motion, and by order dated December 13, 2010, the Court authorized the U.S. Marshal to seize the taxicab and medallion and turn them over to the Trustee's auctioneer.  (Ex. 32.)  On or about December 31, 2010, and following their seizure by the U.S. Marshal, the taxicab and medallion were recovered by the Trustee.[6]  (*See* Stipulated Facts V.)

Figeroux tried to settle the matter.  According to Figeroux, the Trustee insisted on enough cash to pay all of the creditors (approximately $137,000) plus an additional $35,000 to cover his growing administrative expenses.[7]  (Tr. (5/20) at 64:13-25; 69:17-19.)  Figeroux understood that a chapter 7 trustee was entitled to commissions and his attorneys were entitled to receive

---

[6]     The Trustee had also filed a contempt motion against Lindo on December 1, 2010, (Ex.30), but withdrew the motion after the U.S. Marshal seized the taxicab and medallion.  (*See* Letter to Court, dated Jan. 16, 2011 (ECF Doc. # 40).)

[7]     Remarkably, Lindo was able to refinance the medallion on his own during the chapter 7 case.  I say "remarkably" because the taxicab and medallion were property of the estate that only the Trustee could encumber.  Thus, although Lomto disbursed a $137,000 check to Lindo, (Ex. 25), any lien granted by Lindo in the taxicab or medallion would have been invalid.  Lindo brought Lomto check to Figeroux, but it was never cashed because it was payable to Figeroux & Associates, and Figeroux told Lindo to get a check payable to the Trustee.  (Tr. (5/20) at 64:13-25.)

9

compensation, but implied that the Trustee was insisting on more money for his "friends," (Tr.

(5/20) at 62:24-63:4), and felt that the Trustee's demand was excessive.  (Tr. (5/20) at 83:3-10.)

Other than talk settlement, Figeroux did nothing.  He did not submit any response or

opposition to the Trustee's motions, (*see* Ex. 3), or seek to dismiss or convert the case to a

chapter that would have allowed Lindo to retain the taxicab and medallion.   Instead, he offered

two pieces of advice to Lindo: turn over the taxicab and the medallion, (Tr. (5/20) at 59:17-23;

72:13-24; 94:12-23), and get another lawyer, (Tr. (5/20) at 66:4-19; 70:20-71:10; 72:13-24;

94:12-23), because he was "not comfortable" with the issues surrounding the case, (Tr. (5/20) at

66:20-67:1).  Ironically, Figeroux also did not seek to withdraw from representing Lindo because

he had made mistakes and did not want to abandon his client.  (Tr. (5/20) at 91:21-92:21.)

**The Conversion to Chapter 11**

After the Trustee seized the Assets, Lindo discharged Figeroux and retained Jaspan

Schlesinger LLP ("Jaspan").  Lindo then moved to convert the case from chapter 7 to chapter 11

to allow him to regain possession of the taxicab and medallion from the Trustee in his newfound

capacity as a debtor in possession.  (Stipulated Facts Z.)  The conversion motion reasoned that

Lindo could refinance the medallion and successfully implement a plan of reorganization rather

than have the Trustee sell the taxicab and medallion for the benefit of Lindo's estate.  (Stipulated

Facts AA.)  The Trustee initially opposed the conversion motion, (Stipulated Facts BB), but after

several hearings, all parties agreed and the Court signed the order converting the case to chapter

11 on May 5, 2011, as amended on June 1, 2011 (collectively the "Conversion Order").  (*See*

Stipulated Facts DD, EE.)  As a result, Lindo became a debtor in possession and regained

10

possession of the taxicab and the medallion after four months on May 7, 2011.[8]  (Stipulated Facts EE, HH.)

The Conversion Order required Lindo to generate not less than $550,000.00 through the refinancing the medallion and any additional sources to support a proposed Chapter 11 plan. (Stipulated Facts FF.)  Once in chapter 11, he promptly moved to refinance the Assets with Lomto and Barcelona Capital LLC, (Stipulated Facts II), the Court authorized the refinancing pursuant to an Order dated Aug. 17, 2011, (Stipulated Facts JJ; Ex. 34), and Lindo obtained the refinancing proceeds in the total amount of $550,000.00.  (Stipulated Facts KK.)

After receiving the refinancing proceeds, Lindo had to deal with the substantial administrative expenses generated during the chapter 7 case.  Pursuant to an Order Granting Applications for Allowance of First and Final Compensation and Reimbursement of Expenses entered and dated March 12, 2012, the Trustee and his professionals were awarded the following fees and expenses by the Court:

| Richard E. O'Connell | Trustee | 10,375.00 |
|---|---|---|
| Samuel E. Kramer | Trustee's Counsel | 55,520.00 |
| Joseph A. Broderick, CPA | Trustee's Accountant | 1,932.00 |
| MYC & Associates | Trustee's Auctioneer | 4,137.00 |
| MYC & Associates | Trustee's Auctioneer | 6,941.06 |
| | | **$78,905.06** |

---

[8]     On or about October 29, 2010, the Trustee also commenced an adversary proceeding seeking, *inter alia*, to revoke and/or deny Lindo's discharge based upon Lindo's alleged bad faith in not initially disclosing the medallion. (Stipulated Facts R; Ex. 25.)  On May 5, 2011, an order was entered dismissing the adversary proceeding without prejudice. (Stipulated Facts GG.)

(Stipulated Facts LL; Ex. 41.)  Lindo paid these chapter 7 administrative costs, (Tr. (6/5) at

68:10-25), and also paid Lomto its legal fees in the amount of $67,754.12 and pending legal fees

in the amount of $1,500.00 when he refinanced the medallion.  (Ex. 39 at P0392.)

**The Chapter 11 Case**

By Order dated June 28, 2012, the Court confirmed Lindo's Fifth Plan of Reorganization

(the "Plan").  (Stipulated Facts MM; Ex. 42.)  The Plan provided that "[t]he Debtor shall make

addition distributions in the event additional funds are recovered by the Estate."  (*Debtor's Fifth*

*Amended Chapter 11 Plan of Reorganization*, dated June 19, 2012, at 14 (Main Case ECF Doc.

# 119-1).)  The Fourth Amended Disclosure Statement amplified this commitment, revealing the

pendency of this adversary proceeding[9] and stating that any sums recovered would be distributed

to creditors entitled to distribution.  (*Debtor's Fourth Amended Chapter 11 Plan of*

*Reorganization*, dated Mar. 16, 2012, at 2, 17) (*see* Main Case ECF Doc. # 100-2).)  The Plan

did not discharge any debts that accrued during the chapter 7 period.  (Plan at 13.)

Finally, pursuant to an Order dated Oct. 5, 2012, the Court awarded Jaspan final fees as

chapter 11 counsel in the amount of $138,617.15, and expenses in the amount of $3,805.96, for a

total amount of $142,422.96.  (Ex. 43, Schedule B & n.1.)  The Court did not award fees or

expenses to Jaspan for its work during the chapter 7 case but this did not reflect on the value of

those services.  A chapter 7 debtor's counsel is not employed under 11 U.S.C. § 327(a) (referring

to the trustee's retention of professionals), and does not apply to the court for compensation.  *See*

---

[9]        Lindo had commenced this adversary proceeding on September 28, 2011.

11 U.S.C. § 330(a) (2006) (authorizing the court to award compensation to a professional person

employed under section 327).  These fees and expenses were not discharged under the Plan, but

Jaspan has agreed to look solely to the proceeds of this lawsuit to recover its chapter 7 fees and

expenses (as well as any shortfall in the payment of its chapter 11 award).  (Ex. 42 (*Order

Confirming the Debtor's Plan of Reorganization*, dated June 28, 2012 ("*Confirmation Order*"))

at ¶ 15.)

## PROPOSED CONCLUSIONS OF LAW

### A.    Jurisdiction and Venue

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§ 1334(b), 28 U.S.C. § 157(a), the District Court's Order of Reference dated July 10, 1984

(signed by Acting Chief Judge Robert J. Ward) and the Amended Standing Order of Reference,

12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012).  Venue is proper under 28 U.S.C. § 1409(a).  This is a

core proceeding because it arises in a case under title 11.  The malpractice claim accrued when

Lindo filed a chapter 7 petition based on Figeroux's negligent advice, *Rich v. Strada Design

Assocs., Inc.* (*In re Strada Design Assocs., Inc.*), 326 B.R. 229, 237 (Bankr. S.D.N.Y. 2005), and

but for the filing of the chapter 7 petition, Lindo would not have a malpractice claim.

Although this is a core proceeding, the Court concludes that it lacks the authority to enter

a final judgment under *Stern v. Marshall*, 131 S. Ct. 2594, 2600-01 (2011).  The parties have not

consented to that authority and the resolution of Lindo's claim does not implicate the claims

allowance process.  Furthermore, Lindo asserts a common law malpractice claim aimed at

augmenting the estate.  Accordingly, the Court submits these proposed findings and conclusions

in accordance with the Amended Standing Order of Reference.

13

B.    **Liability**

"In order to sustain a claim for legal malpractice, a plaintiff must establish both that the defendant attorney failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession which results in actual damages to a plaintiff, and that the plaintiff would have succeeded on the merits of the underlying action 'but for' the attorney's negligence." *AmBase Corp. v. Davis Polk Wardwell*, 866 N.E.2d 1033, 1036 (N.Y. 2007) (citations omitted); *accord Barbara King Family Trust v. Voluto Ventures*, 849 N.Y.S.2d 41, 43 (N.Y. App. Div. 2007). The attorney may be liable for legal malpractice based on his "ignorance of the rules of practice, failure to comply with conditions precedent to suit, or for his neglect to prosecute or defend an action." *Bernstein v. Oppenheim & Co.*, 554 N.Y.S.2d 487, 489-90 (N.Y. App. Div. 1990); *accord Perkins v. Am. Transit Ins. Co.*, No. 10 Civ. 5655 (CM), 2013 WL 174426, at *17 (S.D.N.Y. Jan. 15, 2013); *Grago v. Robertson*, 370 N.Y.S.2d 255, 258 (N.Y. App. Div. 1975). On the other hand, "an attorney is not held to the rule of infallibility and is not liable for an honest mistake of judgment, where the proper course is open to reasonable doubt [citation omitted]. Thus, "'selection of one among several reasonable courses of action does not constitute malpractice.'" *Bernstein*, 554 N.Y.S.2d at 489 (quoting *Rosner v. Paley*, 481 N.E.2d 553, 554 (N.Y. 1985)).

Figeroux committed malpractice by advising Lindo to file under chapter 7; chapter 7 was the worst place for Lindo to be, and no competent bankruptcy attorney would have given that advice. In chapter 7, the debtor must surrender his non-exempt property to his trustee, who will liquidate the property and distribute the proceeds to the debtor's creditors. *See* 11 U.S.C. §§ 542(a), 704(a)(1). Lindo had substantial equity in the medallion, a fact easily confirmed.

14

Lindo listed a debt to Lomto in the sum of $311,582.00.  (Ex. 6 at P0011.)  According to

Maniscalco, an experienced bankruptcy practitioner, determining the current selling price of a

medallion involves "one Google search" to find information regarding the Taxi and Limousine

Commission's list for average monthly sales.  (Tr. (6/5) at 34:21-35:1-5.)  In this case, Figeroux

apparently had little trouble determining the medallion's value because Lindo's amended

schedules filed after the section 341(a) meeting listed the medallion as worth $600,000.00.  (Ex.

18 at P0044.)  The prospect of seizing and selling a medallion with nearly $300,000.00 in equity

would make any chapter 7 trustee drool.  (Tr. (6/5) at 31:5-7.)

Equally important, Lindo's livelihood depended on the taxicab and medallion.  He

needed both to earn his living.  If a trustee seized them, Lindo would not be able to work.

For a person like Lindo with substantial assets and regular income, there were only two

choices: (1) refinance the asset and pay the creditors outside of bankruptcy; or (2) file a chapter

11 or chapter 13 proceeding, which allows the debtor to retain possession and control of his

assets and propose a plan that pays his creditors.  Maniscalco reviewed Lindo's information, and

opined that he would not have put Lindo into chapter 7.  (Tr. (6/5) at 30:23-31:1.)  If he had

represented Lindo, he would have explained to him that the medallion would be liquidated by a

trustee because it had substantial equity.  (Tr. (6/5) at 31:5-8.)  He would have also explained

that he had the option to refinance the medallion, pull out some equity and negotiate with his

creditors.  (Tr. (6/5) at 32:2-7.)

Even Figeroux agreed in hindsight that a chapter 7 was inappropriate.  He contended that

Lindo did not disclose that he owned a medallion, but if he had, Figeroux would not have filed a

chapter 7 petition, and instead, would have filed under another chapter or refinanced the

15

medallion in the first place.  (Tr. (6/5) at 119:18-120:5.)  Thus, everyone agreed that chapter 7

was not a reasonable alternative, and the question comes down to what Figeroux knew about the

medallion and when he knew it.

Despite Figeroux's assertion that he did not know about the medallion prior to filing, the

schedules he prepared and his own sworn testimony showed that he did.  Initially, Lindo adduced

substantial evidence attesting to Figeroux's shoddy intake procedures.  His one page intake form

did not elicit any relevant financial information from the client.  In contrast, Maniscalco requires

the client to complete a twenty-four page intake questionnaire that elicits all of the financial

information necessary to make an informed decision whether to file bankruptcy, and if so, under

what chapter.  (*See* Plaintiff's Ex. "A.")  His questionnaire effectively mirrors the bankruptcy

petition, schedules and statement of financial affairs.  (Tr. (6/5) at 8:22-9:6.)  Maniscalco also

conducts an initial meeting taking extensive notes, talking to the client and gathering as much

information as he can.  (Tr. (6/5) at 8:12-17.)  After his paralegal prepares the draft petition,

schedules, and SOFA, he reviews them for accuracy and also goes through them, page by page,

with the client.  (Tr. (6/5) at 16:5-17:5.)  In contrast, Lindo primarily dealt with a paralegal who

recorded his answers to the paralegal's questions directly into a computer program.

Regardless of the method that was used, it should have been obvious to Figeroux that the

schedules and SOFA raised red flags that required his attention.  As noted earlier, these included

the listing of unencumbered real property on Schedule A that was encumbered by two liens

according to Schedule D, the listing of a twenty-three year old yellow taxicab on Schedule B, the

failure to dispute any of the fraudulently incurred unsecured debts on Schedule F, the statement

of an intention to surrender and retain the same piece of collateral, the statement that Lindo had

16

not earned any gross income in 2008, 2009 and 2010 and the statement that he had not paid a

retainer to Figeroux when Figeroux had signed a disclosure that Lindo had paid him a $3,500.00

retainer.  Had he reviewed the schedules with or without Lindo, he would have known that he

did not have an accurate picture of Lindo's assets and liabilities when he advised him to file

under chapter 7.

Most important, although the schedules referred to the taxicab and the medallion without

connecting them, Figeroux knew that Lindo owned a taxi medallion.  After Figeroux failed to

answer the complaint in this adversary proceeding, Lindo moved to enter a default judgment;

Figeroux objected and moved to vacate his default.  Figeroux submitted an affirmation in

opposition to Lindo's motion in which he made the following admission:

> *The Debtor disclosed that he owned a taxi medallion and a taxi during the
> preparation of the petition.*  The debtor informed the firm and provided
> documentation that the medallion was a secured claim to which the amount owed
> was $307,000 dollars [*sic*].  The Debtor sought to reaffirm the debt, and
> appropriate re-affirmation documents were submitted with the chapter 7 petition.
> (See Exhibit A).

(Ex. 44 at ¶ 4 (p. 3 of 26) (emphasis added).)

The referenced exhibit, (Ex. 44, at pp. 4-8 of 26), a Reaffirmation Agreement that

Figeroux prepared for Lindo, is dated one week after the Petition Date.  In it, Lindo agreed to

reaffirm a "MEDALLION LOAN" in the amount of $307,354.00.  (Ex. 44, at p. 5 of 26.)  Both

Lindo and Figeroux signed the form.  (Ex. 14 at P0143.)  Figeroux's signature constituted his

certification that the reaffirmation agreement represented a "fully informed and voluntary

agreement by the debtor [that would] not impose an undue hardship on the debtor or any

dependent of the debtor."  (Ex. 14 at P0143.)  Figeroux could not have certified that Lindo was

"fully informed" if Figeroux had not explained to Lindo what the Reaffirmation Agreement

17

meant and why it made sense to reaffirm the debt rather than surrender the collateral. Accordingly, Figeroux knew about the taxi medallion and could have easily determined its current market and Lindo's substantial equity prior to filing the petition.

Figeroux also knew or should have known that Lindo's business generated net income and his household had positive cash flow. He scheduled monthly operating income of $6,083.33, (Ex. 6 at P0017), and monthly operating expenses of $3,300.00. (Ex. 6 at P0018.) As noted earlier, Figeroux's staff double counted the monthly payment of $2,400.00 made in connection with the medallion. Reducing his monthly expenses by $2,400.00 resulted in monthly positive cash flow of $1,123.38. (*See* Ex. 6 at P0018.)

Accordingly, Figeroux failed to exercise a reasonable degree of skill and care commonly exercised by an ordinary member of the legal community when he advised Lindo to file under chapter 7 of the Bankruptcy Code. (*See* Tr. (6/5), at 36:19-37:5.) This was not a mere error in judgment in selecting one among several reasonable courses of action. By Figeroux's own admission, Lindo did not belong in chapter 7 in light of the medallion, and although Figeroux knew Lindo owned a medallion with substantial equity, he nonetheless advised him to file under chapter 7.

The initial malpractice was exacerbated by what followed. As a result of the section 341(a) meeting, even Figeroux admitted he knew about the medallion. The injury resulting from the chapter 7 filing was still cheap to fix, and Figeroux pursued the right strategy; he filed a motion to dismiss the case pursuant to 11 U.S.C. § 305 immediately after the section 341(a)

meeting.  (*See* Ex. 16.)[10]  Up to this point, the Trustee had not retained a lawyer, accountant or

auctioneer, and had not incurred any administrative expenses to recover the medallion and

taxicab.  Nor had he insisted that Lindo set aside or provide the Trustee with the funds to pay his

creditors.[11]  The Trustee only insisted that the dismissal order bar Lindo from refiling for two

years.  However, Figeroux withdrew the motion to dismiss five days later, because the Trustee

indicated that critical information was missing, without prejudice to refiling the motion "once the

Trustee's concerns have been addressed."  (Ex. 17.)

Figeroux never pursued the motion to dismiss again, and the Trustee took steps to recover

the taxicab and medallion.  In response, Figeroux abandoned Lindo.  He did not respond to the

Trustee's motions or advise Lindo to exercise his *absolute* right to convert the case to a chapter

11 or 13, *see* 11 U.S.C. § 706(a), which would have automatically terminated the Trustee's

service, 11 U.S.C. § 348(e), and allowed Lindo to retain his assets and pursue an in-court

workout through a confirmed plan.  Instead, Figeroux made an unsuccessful attempt to settle

---

[10]     Section 305 states in relevant part:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all
> proceedings in a case under this title, at any time if—(1) the interests of creditors and the debtor
> would be better served by such dismissal or suspension . . . .

Although the legislative history indicates that § 305(a) was intended to serve as an antidote to an involuntary
petition that threatened to scuttle an ongoing out of court workout, *see* H.R. REP. NO. 95-595, at 325 (1977); S. REP.
NO. 95-989, at 35 (1978), the language of the statute is sufficiently broad to cover voluntary cases, and reflects a
policy that favors less costly out-of-court workouts.  *In re Colonial Ford, Inc.*, 24 B.R. 1014, 1015-16 (Bankr. D.
Utah 1982); *see In re Chateaugay Corp.*, 961 F.2d 378, 382 (2d Cir. 1992).  Lindo's motion failed to mention it, but
the section 341(a) meeting transcript confirmed Lindo's intention to refinance his medallion and pay his creditors
outside of bankruptcy.

[11]     In fact, the idea was to pay the creditors outside of bankruptcy.  Since the Trustee would not be distributing
any money, he would not earn a commission.  *See* 11 U.S.C. § 326(a).

with the Trustee, and advised Lindo to turn over the Assets and find another lawyer.  In the meanwhile, the Trustee's administrative expenses skyrocketed in large part because Figeroux ignored the Trustee's motions and ensuing orders.  All of the chapter 7 expenses that Lindo seeks to recover arose after the section 341(a) meeting and were proximately caused by (1) the erroneous decision to file under chapter 7, (2) the failure to remedy the error after Figeroux admitted he knew Lindo owned a valuable medallion with substantial equity, and (3) Figeroux's abandonment and neglect of Lindo's interests once the Trustee began his collection efforts.

According to Figeroux, he attempted to negotiate a resolution with the Trustee, but the latter's demand of an additional $35,000.00 to cover his administrative expenses was excessive.  Even if Figeroux could not agree with the Trustee on the amount of the Trustee's expenses, Figeroux could have always converted the case to chapter 11 or chapter 13 and negotiated or dealt with the Trustee's fees at a later date.  In the meantime, he would have displaced the Trustee and cut off the continuing accrual of chapter 7 administrative expenses generated by (1) the efforts of the chapter 7 Trustee to recover the medallion and taxicab in the face of Lindo's seeming obstinacy and (2) the filing of an adversary proceeding objecting to Lindo's discharge based on errors in the schedules and SOFA that Figeroux had prepared.

C.    **The Damages**

Figeroux's malpractice proximately caused damages in the sum of $134,224.37.

1.    **Chapter 7 Administrative Expenses**

The bulk of damages in the sum of $78,905.06 are attributable to what Lindo paid to the Trustee and to his attorney, accountant and auctioneer for services rendered during the chapter 7 period.  These damages were proximately caused by the erroneous decision to file chapter 7 and

20

the subsequent failure to remedy the situation by failing to prosecute the motion to dismiss or

convert the chapter 7 case to one under chapter 11 or chapter 13.  But for these breaches of

Figeroux's professional duties, Lindo would not have suffered these damages.

### 2.      Jaspan's Chapter 7 Fees

The next largest component of Lindo's damages relates to the services rendered by

Jaspan during the chapter 7 case.  In New York legal malpractice actions, a plaintiff may recover

litigation expenses incurred to "avoid, minimize, or reduce the damage caused by the attorney's

wrongful conduct."  *Bua v. Purcell & Ingrao, P.C.*, 952 N.Y.S.2d 592, 598 (N.Y. App. Div.

2012); *accord Leach v. Bailly*, 870 N.Y.S.2d 138, 140 (N.Y. App. Div. 2008); *see Rudolf v.

Shayne, Dachs, Stanisci, Corker & Sauer*, 867 N.E.2d 385, 388 (N.Y. 2007) (plaintiff entitled to

recover damages for litigation expenses suffered as a result of legal malpractice that required a

second trial.)  The award is intended to make the plaintiff whole.  *Rudolf*, 867 N.E.2d at 388; *see

also Campagnola v. Mulholland, Minion & Roe*, 555 N.E.2d 611, 613 (N.Y. 1990).

Lindo incurred legal fees in the amount of $41,525.25 and expenses in the amount of

$554.74 to Jaspan for services rendered during the chapter 7 period between January 21, 2011

and May 4, 2011.  (*See* Plaintiff's Ex. "D," at P0623-P0630.)  As in the case of the Trustee's

administrative expenses, Lindo demonstrated that he would not have owed fees to Jaspan for any

chapter 7 work if Figeroux had not mistakenly advised him to file chapter 7 and then failed to

remedy his error.  Moreover, Lindo's chapter 7 debts were not discharged under the plan, and he

remains liable to pay Jaspan from the proceeds of this lawsuit.

Although Figeroux did not take issue with the proposition that Jaspan's chapter 7 fees

were recoverable as damages, he asserted general objections to time spent researching issues

relating to Lindo's chapter 7 case.  He also asserted specific objections to the following services

rendered by Shannon Scott, Esq., the Jaspan attorney responsible for the matter, because the time

records referred to telephone calls or conferences but did not detail the reason for the phone call

or what was discussed (*Defendants' Proposed Findings of Fact and Conclusions of Law*, filed

Aug. 1, 2013, at ¶ 86 (ECF Doc. # 36)):

| Date of Service | Description | Time Billed |
|---|---|---|
| 1/21/2011 | Conference with SRS | 0.4 |
| 1/21/2011 | conference with Trustee's counsel | 0.2 |
| 1/25/2011 | call Court | 0.3 |
| 1/28/2011 | Prepare application for approval of substitute counsel; conference with RC regarding the same | 1.0 |
| 1/31/2011 | Spoke with Trustee | 0.2 |
| 1/31/2011 | Conference with secured creditor's counsel; coordinate conference call | 0.3 |
| 2/8/2011 | speak with accountant | 0.2 |
| 4/4/2011 | Confer with SRS, client meeting | 1.6 |
| 4/8/2011 | call counsel to the Trustee | 0.2 |
| **Total** | | **4.4** |

Figeroux's general objection is overruled; if Jaspan attorneys spent time researching

chapter 7 issues, it was only because Figeroux negligently put Lindo in a chapter 7 proceeding,

and Jaspan had to extricate Lindo from it.

Figeroux's specific objections to vague entries stand on firmer ground.  Addressing the

analogous question of fee awards, courts have observed that vague and ambiguous descriptions

of work done prevent the court from assessing the reasonableness of the work, and should be

eliminated or reduced.  *Cosgrove v. Sears, Roebuck & Co.*, No. 81 CIV. 3482 (AGS), 1996 WL

99390, at *3 (S.D.N.Y. Mar. 7, 1996) ("[M]any of the descriptions of the work performed are

vague, including entries such as 'review of file,' 'review of documents' and 'review of

[adversary's] letter.'  There can be no meaningful review of time records where the entries are

too vague to determine whether the hours were reasonably expended."); *accord Dotson v. City of*

*Syracuse*, No. 5:04-CV-1388 (NAM/GJD), 2011 WL 817499, at *24 (N.D.N.Y. Mar. 2, 2011)

("Descriptions of work such as 'review of file', 'review of documents' and 'review of letters' are

vague and do not permit a court to evaluate the reasonableness of the services."); *Schruefer v.*

*Winthorpe Grant, Inc.*, No. 99 Civ. 9365 (GBD)(AJP), 2003 WL 21511157, at *3 (S.D.N.Y. July

2, 2003) (imposing overall reduction of ten per cent based on vague time entries including

"various phone conferences," "review file," "legal research," and "case administration").

Similarly, vague and ambiguous descriptions prevent the Court from identifying the precise

nature of the legal service that was proximately caused by Figeroux's malpractice.

All of the time records identified in the table immediately above, except for the entry on

January 28, 2011, are vague.  They refer to phone calls or other communications, but do not

identify the nature of the communication.  In fact, the services may have been unrelated to the

chapter 7.  Lindo bears the burden of proving that his damages were proximately caused by

Figeroux's malpractice, and the vague descriptions fall short.  These vague entries account for

3.4 hours of Scott's time.  Her hourly billing rate was $410.00 for all but 0.9 hours of the total

time billed, (Plaintiff's Ex. "D," at P0629), and $1,394.00, will be deducted from the total

amount sought by Lindo on account of Jaspan's services during the chapter 7 period.

The objection regarding the January 28, 2011 entry is overruled.  The entry states that the

services pertained to the preparation of an application to substitute counsel— Jaspan for

23

Figeroux.  The need to substitute counsel was directly related to Figeroux's mishandling of

Lindo's case, and in fact, was consistent with Figeroux's advice.  Accordingly, the balance of

time billed during the chapter 7, $40,131.25, is recoverable as damages.  In addition, Figeroux

has not objected to Jaspan's disbursements in the sum of $554.74, and the disbursements are also

recoverable.

### 3.    Lost Wages

Lindo is also entitled to recover four months of lost wages.  The Trustee seized the

medallion and taxicab on or about December 31, 2010, and did not return the assets to Lindo

until May 6, 2011 following the conversion to chapter 11.  But for the filing of a chapter 7 case,

the Assets would never have been seized.  According to his Schedules I and J, his net monthly

income from the operation of his business was $2,783.33.[12]  (Ex. 6 at P0017-P0018.)  He is,

therefore, entitled to recover $11,133.32 in lost wages.[13]

### 4.    Retainer

Lindo is entitled to recover the $3,500.00 retainer he paid to Figeroux.  "The attorney's

malpractice constitutes a failure to honor faithfully the fidelity owed to the client and to

---

[12]    Monthly gross wages ($6,083.33) minus average monthly expenses ($3,300.00).  (Ex. 6 at P0017-P0018.)

[13]    Although an injured party has a duty to mitigate its damages by making "reasonable efforts and to act as a reasonable, prudent man would under the circumstances," Salas *v. United States*, 974 F.Supp. 202, 211 (W.D.N.Y. 1997); *see also State v. Samfred Beltline Corp.*, 297 N.Y.S.3d 466, 469 (N.Y. App. Div. 1969), the burden rests on the defendant to prove that the plaintiff failed to mitigate damages.  *Cornell v. T.V. Dev. Corp.*, 215 N.E.2d 349, 352 (N.Y. 1966); *Eskenazi v. Mackoul*, 905 N.Y.S.2d 169, 171 (N.Y. App. Div. 2010); *Hawkins v. City of New York*, 470 N.Y.S.2d 420, 421-22 (N.Y. App. Div. 1984).  Figeroux did not offer evidence that Lindo mitigated his damages by working during the four months, or that he failed to make reasonable efforts to find employment.

24

discharge competently the responsibilities flowing from the engagement." *Campagnola*, 555

N.E.2d at 614.  Acts of malpractice affect the reasonable value of the legal services performed,

and provide a defense to the attorney's claim for unpaid legal fees even in the absence of damage

to the client.  *Redgrave v. Musselman (In re Finley, Kumble, Wagner, Heine, Underberg,*

*Manley, Myerson & Casey*), 157 B.R. 1, 5 (S.D.N.Y. 1993), *aff'd mem.*, 22 F.3d 1091 (2d Cir.

1994).  The Court may, in this regard, cancel any retainer agreement relating to the bankruptcy

case, and order the attorney to return the retainer to the extent the retainer exceeds the reasonable

value of the services rendered.  11 U.S.C. § 329.[14]  Figeroux's services were rendered in such a

negligent manner that they had no reasonable value, and accordingly, Lindo is entitled to recover

the retainer in the sum of $3,500.00 that he paid Figeroux pursuant to 11 U.S.C. § 329(b).

---

[14]    Section 329 states:

> (a) Any attorney representing a debtor in a case under this title, or in connection with such a case,
> whether or not such attorney applies for compensation under this title, shall file with the court a
> statement of the compensation paid or agreed to be paid, if such payment or agreement was made
> after one year before the date of the filing of the petition, for services rendered or to be rendered in
> contemplation of or in connection with the case by such attorney, and the source of such
> compensation.
>
> (b) If such compensation exceeds the reasonable value of any such services, the court may cancel
> any such agreement, or order the return of any such payment, to the extent excessive, to—
>
>> (1) the estate, if the property transferred—
>>
>>> (A) would have been property of the estate; or
>>>
>>> (B) was to be paid by or on behalf of the debtor under a plan under chapter 11,
>> 12, or 13 of this title; or
>>
>> (2) the entity that made such payment.

### 5.      Jaspan's Chapter 11 Fees

The amounts billed by Jaspan during the chapter 11 period, and ultimately paid pursuant to the Plan, are not recoverable as damages because they were not proximately caused by Figeroux's malpractice.  Lindo alleged that Figeroux committed malpractice by putting him in chapter 7 instead of advising him to refinance the medallion and pay off his creditors outside of bankruptcy or through a chapter 11.  (*See Complaint*, dated Sept. 28, 2011, at ¶¶ 28, 88, 126(e), 129) (ECF Doc. # 1-1).)  Had Figeroux followed the chapter 11 route, Lindo would have had to pay professional fees to his chapter 11 counsel.  Lindo failed to show that Figeroux's malpractice increased the amount of those fees.

### 6.      Lomto Fees

Lindo failed to demonstrate that the fees he paid to Lomto, aggregating $69,254.12, were proximately caused by Figeroux's malpractice.  Lindo's malpractice claim centered on the contention that he could have refinanced the medallion and paid off his creditors outside of bankruptcy or through a chapter 11 plan.  Thus, the refinancing was unrelated to the malpractice, and he would have had to pay Lomto's legal fees anyway.  Although Lomto's participation in the chapter 7 proceedings may have increased the fees that Lindo ultimately paid, he did not offer evidence to show how the fees were computed or whether some fees could have been avoided.  Hence, an award for those fees would be purely speculative.

26

In conclusion, and based on the foregoing, I recommend that the defendants be adjudged liable for malpractice, and that Lindo recover damages in the sum $134,224.37 to be distributed in accordance with the Plan and the Confirmation Order.

Dated: New York, New York
        September 16, 2013

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge